(C.D. 2487)

## T. H. GONZALEZ *v.* UNITED STATES

United States Customs Court, Third Division

(Decided on rehearing [C.D. 1949] October 26, 1964)

*Stein and Shostak* (*Richard M. Kozinn, Marjorie M. Shostak,* and *S. Richard Shostak* of counsel) for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*Richard H. Welsh, William J. Vitale, Murray Sklaroff, Henry J. O'Neill, Richard E. FitzGibbon,* and *Mollie Strum,* trial attorneys), for the defendant.

Before DONLON and RICHARDSON, Judges; DONLON, J., concurring

RICHARDSON, Judge: This is a rehearing of a case decided by this court on December 24, 1957. *T. H. Gonzalez* v. *United States*, 40 Cust. Ct. 9, C.D. 1949.

The merchandise consists of fluorspar, which was assessed with duty at $8.40 per long ton under paragraph 207 of the Tariff Act of 1930 as fluorspar, containing not more than 97 percent of calcium fluoride. It is claimed that the merchandise contains more than 97 percent calcium fluoride and is dutiable at $2.10 per long ton under said paragraph 207, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739.

At the original hearing, it was stipulated that the official sample of the merchandise and that used by the importer were taken by the Eagle Pass Laboratory, Eagle Pass, Tex., and that said samples were representative of the merchandise.

One of the samples was analyzed at the Eagle Pass Laboratory by a method developed by Dr. Schrenk of the Missouri School of Mines, and the calcium fluoride content was determined to be 97.10 percent. Other samples were analyzed at the Fluorita de Mexico mine, before shipment of the merchandise, by the Bidtel method but the samples used were found to be unrepresentative. Analyses were made of two samples at the United States Customs Laboratory at New Orleans by the National Bureau of Standards Method, also known as United States Customs Laboratory Method No. 207.1, and the umpire method (hereinafter referred to as Method No. 207.1). This method involves the use of a reference sample known as sample No. 79, having a known calcium fluoride content, to check the results of the tests. Twenty-two analyses were made, 18 of which were taken through the entire method. The lowest percentage found was 96 percent and the highest 96.74 percent, the majority of the determinations corresponding very closely to the average which was 96.64 percent.

In its opinion the court pointed out that the method prescribed by the Bureau of Standards had been approved in *Wm. A. Bird* v. *United States*, 63 Treas. Dec. 980, T.D. 46437, and held: that plaintiff had not met his burden of overcoming the presumption of correctness attaching to the collector's classification of the merchandise and had not established that the merchandise was properly dutiable as fluorspar, containing more than 97 per centum calcium fluoride.

Subsequently, a motion for rehearing was granted and the cause of action restored to the docket for all purposes. *T. H. Gonzalez* v. *United States*, 40 Cust. Ct. 453, Abstract 61560. A stipulation was entered into directing officials at the United States Customs Laboratory at New Orleans to withdraw certain portions from the samples remaining at the laboratory for analysis. These samples and a portion of the sample

originally taken by Mr. Roche were analyzed by various chemists using different methods.

Mr. Charles O. Parker, a chemist and mining engineer, operating a laboratory in Denver, ran tests by three methods: Method 207.1; a modified United States Customs Laboratory method known as 207.1A, and the method which he employs in his laboratory which is a modification of the Bidtel method. In making the analyses he ran tests on a reference sample of known calcium fluoride content concurrently with the unknown sample. This sample was one he had prepared himself and contained a calcium fluoride content of 97.17 percent. He obtained the following results:

| | Customs sample | Eagle Pass sample |
|---|---|---|
| Parker method | 97. 30 | 97. 28 |
| No. 207.1 | 96. 96 | 97. 01 |
| No. 207.1A | 97. 07 | 96. 99 |

Mr. Parker stated he did not like Method No. 207.1 because of the extreme number of manipulations and that, in his opinion, commercially and in daily practice, there would be a greater chance of loss of calcium fluoride content by use of the customs method because it requires greater dexterity.

E. J. Mueller, chief research chemist associated with American Smelting and Refining Co., Mexican Mining Department at El Paso, Tex., made 18 separate analyses of a sample received from Mr. Roche, by three separate methods, Method No. 207.1, Method No. 207.1A, and his own method, known as the Mexican Mining Department method. According to the witness, the latter is a method applicable only to acid grade fluorspar and is a streamlined version of a general method applicable to all grades of fluorspar. The reference sample used with these tests was a standard sample prepared under the supervision of the witness from 10 kilos of fluorspar concentrate with a known calcium fluoride content of more than 97 percent.

Three sets of tests of duplicate samples were run on three successive days with the following results:

| Method | First day | Second day | Third day | Average shown in plaintiff's exhibit 9 |
|---|---|---|---|---|
| 207.1 | 96. 84% | 96. 87% | 97. 04% | 96. 89% |
| | 97. 04% | 96. 78% | 96. 80% | |
| 207.1A | 96. 94% | 97. 03% | 97. 06% | 97. 03% |
| | 97. 10% | 97. 06% | 96. 96% | |
| Mexican Mining | 97. 10% | 97. 10% | 97. 00% | 97. 07% |
| | 97. 10% | 97. 06% | 97. 04% | |

Mr. Mueller stated that, in his experience, Method No. 207.1 produces uniformly low results because of the difficulty of application.

He said that it was basically sound but that mistakes and mechanical losses occurred because of the human element in applying the method and because all laboratories do not have the equipment called for. On the other hand, the Mexican Mining Department method required fewer steps and produced results that were equal in accuracy. In his view, the advantages of that method were that it was so simple that it could be used by people having no technical knowledge and that it took only 3 hours to run. Therefore, in his opinion, it was of greater practicability in the field of producing acid grade fluorspar or in processing such ores, since analyses could be obtained within a very short time. He explained that the method could be used where a product was relatively free of impurities and said that, in the samples tested here, the principal impurities were calcium carbonate and silica, a small percentage of aluminum oxide, and a trace of iron. The samples were not tested for other impurities and other chemical elements.

Bernard E. Kelley, a chemist connected with Booth, Garrett & Blair, a company founded in 1836, whose business is sampling, weighing, and analyzing metallurgical grade ores, testified that, in making his analyses of samples of the fluorspar involved herein, he used the same method as that described in *Ozark-Mahoning Company* v. *United States*, 41 Cust. Ct. 16, C.D. 2015, the Booth, Garrett & Blair method. He said that, when used by a skilled chemist, that method does not produce any significant mechanical loss, nor does Method No. 207.1. Both methods require a space of 3 days to run. He made analyses by both methods and Method No. 207.1A and obtained the following results.

| | Customs sample | Eagle Pass sample |
|---|---|---|
| Booth, Garrett & Blair | 96. 63% | 96. 86% |
| No. 207.1 | 96. 71% | 96. 71% |
| No. 207.1A | 97. 01% | 97. 01% |

In his opinion, the calcium fluoride content was between 96.63 and 96.86 percent.

Melvin Lerner, chief chemist of the Baltimore Customs Laboratory, testified that, in the course of his duties, he had investigated all available methods of analyzing fluorspar and found that it was not easy to test any method because fluorspar is a naturally occurring mineral and is quite variable in its composition. Aside from the Bureau of Standards sample, there were no standard samples in existence. Finally, he found that the Harshaw Chemical Co. was producing synthetic calcium fluoride crystals for use as infrared prisms. The Government purchased some and it was analyzed as 99.999 percent pure calcium fluoride. From this standard, synthetic samples could be prepared. Pure calcium fluoride was weighed out, known amounts of impurities added, and then, using different methods, he and other chemists in

his laboratory tried to recover the pure calcium fluoride in the sample. If a half gram of pure calcium fluoride was put in and the method resulted in a half gram, it was accurate. If it resulted in over or under a half gram, it was not accurate. The witness then tested Method No. 207.1, Method No. 207.1A, the Schrenk method, the Bidtel method, and the Mexican mining method. With high grade fluorspar, assaying 98½ percent calcium fluoride, all methods gave accurate results except the Schrenk method. When 97 percent calcium fluoride was used, and the impurities consisted solely of calcium carbonate, silica, and a small amount of iron, the results were also accurate, but if additional impurities were present, such as barium, magnesium, and lead, in other than very minute quantities, the only methods that gave accurate results were Methods No. 207.1 and No. 207.1A. The other methods tended to give high results due to the fact that some of the impurities were counted as calcium fluoride. When the calcium fluoride content dropped to 95 percent, the only method that would give accurate results was Method No. 207.1.

The witness stated that he has made approximately 1,000 analyses of calcium fluoride for the United States Customs Laboratories, and that there are no significant differences between the so-called Bureau of Standards Method and Method No. 207.1. When used by a skilled chemist it does not produce any significant mechanical loss.

Mr. Lerner analyzed samples of the within merchandise by three different methods personally and a chemist under his supervision also analyzed it. The results obtained were as follows:

| | Lerner | | Mills |
|---|---|---|---|
| No. 207.1 | 96. 72% | No. 207.1A | 96. 69% |
| No. 207.1A | 96. 76% | Mexican Mining | 97. 04% |
| Mexican Mining | 97. 01% | | |

In running the tests Mr. Lerner used as a control a known synthetic sample made from pure calcium fluoride, having a calcium fluoride content of 97 percent, with added impurities consisting of calcium carbonate, silica, iron, aluminum, magnesium, and small amounts of barium and lead. It tested out to within the acceptable limits of five-hundredths of a percent.

In Mr. Lerner's opinion the reason for the difference in the results obtained by the Mexican mining method and by Methods No. 207.1 and No. 207.1A was the presence of a relatively large amount of magnesium. He explained that the Mexican mining method is applicable only to material containing calcium carbonate, silica, and a small amount of iron as impurities. In the instant case, it was determined by the spectrographic method that there was approximately a quarter of a percent of magnesium present in the form of magnesium fluoride. The presence of magnesium would not affect the results by Method

No. 207.1 since that method makes full and adequate provision for the separation of magnesium prior to the final precipitation, but the Mexican mining method permitted magnesium to coprecipitate with calcium and be counted as calcium fluoride. According to the witness, Method No. 207.1 eliminates all impurities, but the other methods do not. Therefore, for merchandise like that at bar, Methods No. 207.1 and No. 207.1A are the most accurate. In his opinion the calcium fluoride in the merchandise at bar was 96.7 percent.

Mr. Mueller, recalled as a witness for the plaintiff, testifield that, in his experience, calcium fluoride and magnesium would not coprecipitate in the Mexican mining method. He said, however, that he did not analyze the material here for magnesium because it had been established by many tests that that element would not interfere under the conditions set up in the Mexican mining method and that coprecipitation would not take place except in minute quantities.

As was stated in our original decision in this case, *T. H. Gonzalez v. United States, supra,* at page 14:

It is well settled that the methods of testing and weighing merchandise used by customs officials are presumptively correct and that the burden is upon the importer to show that such methods or the results obtained are erroneous. *United States* v. *Gage Bros.,* 1 Ct. Cust. Appls. 439, T.D. 31503; *United States* v. *Lozano, Son & Co.,* 6 Ct. Cust. Appls. 281, T.D. 35506; *Draper & Co., Inc.* v. *United States,* 28 Cust. Ct. 136, C.D. 1400; *Resolute Paper Products Corp.* v. *United States,* 31 Cust. Ct. 285, Abstract 57595.

Plaintiff claims that the record now presented establishes that Method No. 207.1 is subject to mechanical losses and is not suitable or proper for determining the classification of fluorspar. It is also claimed that Method No. 207.1 and the Bureau of Standards method are not identical and that approval of the latter in *Wm. A. Bird* v. *United States, supra,* does not extend to the former. It is further claimed that the reference samples used by the Government's witnesses are not as reliable as those used by the plaintiff's witnesses.

It is clear from the record that the customs method, Method No. 207.1 is the same as that followed by the Bureau of Standards, except that for customs purposes, the complete analysis is carried out as to calcium fluoride only, and that Method No. 207.1 is merely an attempt to clarify the Bureau of Standards method.

Method No. 207.1 involves the use of a standard reference sample, known as Bureau of Standards reference sample No. 79, having a calcium fluoride content of 94.83 percent. Although plaintiff claims that it is not as accurate to use a reference sample containing a lesser quantity of the component to be determined than is contained in the product under analysis, his witnesses used the Bureau of Standards sample when it was available. Furthermore, there is nothing in the record to indicate that the reference samples prepared and used by

plaintiff's witnesses were any more accurate than the standard reference sample of the Bureau of Standards. As stated by Mr. Lerner, it would be impractical to require the use of a sample having the same quantity of the component to be determined, since the unknown would have to be analyzed first, then a synthetic standard sample prepared, and then a further analysis made. In his opinion, a standard sample that differed by a full 5 percent from the unknown would be a good control.

The principle criticism of Method No. 207.1 is that it involves too many manipulations and is subject to mechanical loss in the hands of ordinary technicians. However, plaintiff's witnesses repeatedly stated that the method was sound, although it required greater skill to use.

The other methods were criticized by the Government chemists on the ground that they permitted impurities such as barium, strontium, and magnesium to coprecipitate with calcium and be counted as calcium fluoride in the final assay. Mr. McCombs said that the Bidtel method was at one time considered standard but that it had been rejected by many laboratories, including the customs laboratory. He admitted that some mining firms which do not require a close quality control might still find it advantageous to use.

According to the testimony, there is no scientifically accurate method for the determination of fluorspar because of the variety of its composition. Therefore, the most significant testing brought out by the record was that done by Mr. Lerner in analyzing a known synthetic sample by the various methods. By this means, he found that Method No. 207.1 was the most accurate under all conditions. This testimony has not been rebutted nor was any witness produced to refute it, except Mr. Mueller who stated only that when the Mexican mining method is properly applied, magnesium will not coprecipitate with calcium.

The record presented establishes that Method No. 207.1 is the most accurate method of analysis of all grades of fluorspar, although other methods may be equally accurate as to high grade fluorspar.

The fact situation here is entirely different from that presented in *Ozark-Mahoning Company* v. *United States, supra.* There it appeared that both the Bidtel method and the Bureau of Standards method, each with modifications, were currently in use by analytical chemists and were accepted by other chemists in industry, but the evidence did not establish which of the methods was *per se* the most accurate. The controlling factor in the decision, therefore, was the accuracy of the particular analyses presented for consideration. The analyses made by the Government chemist were held to be less accurate because of the variances in the results obtained by him in

156

comparison with determinations of other chemists which checked more closely with their own results and with those obtained by others.

In the instant case, we have found that Method No. 207.1 is the most accurate method. Therefore, unless the analyses under that method are shown to be incorrect, they must be accepted as determining the amount of calcium fluoride in the fluorspar involved herein. The analyses made by this method by the chemists who testified showed a calcium fluoride content of less than 97 percent, except a test of the Eagle Pass sample by Parker (97.01 percent) and two of the tests of that sample by Mueller (97.04 percent). The average of Mr. Mueller's testing, however, was 96.89 percent.

Where a material is close to the line, as was the case here, according to Mr. Lerner, the only way to determine whether it is over or under is to make an extensive series of tests, since the greater number of tests, the greater the certainty.

In the instant case an extensive series of tests was made by the New Orleans Customs Laboratory, the majority of which gave results close to the average of 96.64 percent. Furthermore, Mr. Lerner accounted for the deviation between the results obtained by Method No. 207.1 and the Mexican mining method by the fact that the sample contained a quarter of a percent of magnesium which was detected by the spectrographic method.

Therefore, the method used and the results obtained by the Government's chemists have not been shown to be erroneous, but rather to be correct and establish that the calcium fluoride content of the within merchandise was less than 97 percent.

Plaintiff claims, however, that a practical, commercially accepted and feasible method of analysis should be recognized as the proper one for the determination of the calcium fluoride content of fluorspar rather than Method No. 207.1, on the ground that where a scientific determination or principle is in conflict with an actual, practical, commercial application, the latter is to control.

Plaintiff relies upon such cases as *Kuttroff, Pickhardt & Co. (Inc.)* v. *United States*, 13 Ct. Cust. Appls. 210, T.D. 41055; *United States* v. *Fred Whitaker Company, Inc.*, 40 CCPA 19, C.A.D. 492; *United States* v. *Esso Standard Oil Co.*, 41 CCPA 171, C.A.D. 546; *C. J. Tower & Sons* v. *United States*, 33 Cust. Ct. 181, C.D. 1651.

*Kuttroff, Pickhardt & Co. (Inc.)* v. *United States, supra,* involved tests of an imported dye to determine whether it was competitive with a domestic dye, and it was held that tests should not have been made on material for which the dye was commercially unsuitable. In *United States* v. *Fred Whitaker Company, Inc., supra,* it was held that the term "clean content" of wool meant the commercial yield of clean wool

not including the unrecoverable and unavoidable loss incident to the cleaning process. A laboratory test by customs officials which included the latter was rejected.

In the *Esso* case, *supra*, in resolving a conflict of expert opinion regarding the proper technical classification of a chemical, it was held that greater weight should be accorded the testimony of a highly skilled technician from the cream of the technical chemical industry than that of a professor, who was also a chemist, but whose experience had not been in the chemical industry.

The case most closely analogous is *C. J. Tower & Sons* v. *United States*, *supra*, which involved the Roese-Gottlieb method of analyzing buttermilk to obtain the percentage of butterfat therein. Under this method, phospholipins and sterols were included as butterfat, although technically and scientifically they were not butterfat. The court said (pp. 189–190) :

> Mr. Thompson stated that in the trade the terms "fat," "butterfat," and "milk fat" are used synonymously; that phospholipins and sterols are regarded as a part of butterfat; and that it is customary to determine fat or butterfat content by the Roese-Gottlieb method. The standards, issued by the American Dry Milk Institute and the Association of American Feed Control Officials, and the federal specifications for milk and milk products support these statements. They show that the trade considered analyses of milk products, including dried buttermilk, by the Roese-Gottlieb method to be a sufficient determination of butterfat content. The American Dry Milk Institute represents 85 percent of the firms engaged in the dry milk industry, and preparation of its standard was begun when dried buttermilk became an important commercial product for other than cattle feeding purposes. The definition adopted by the Association of American Feed Control Officials in 1932 is a standard for use by the feed industry. The federal specifications set forth the requirements to be met in connection with Government purchases of milk products. Taken together, the testimony and the documentary evidence are persuasive that the term "butterfat" is commercially understood to mean the fatty substances, including phospholipins and sterols, found in milk or in products derived from milk and that the butterfat content of an unadulterated dairy product is determined in the trade by the Roese-Gottlieb process.

In the instant case, there is no evidence that in the trade the term "calcium fluoride" meant calcium fluoride, plus impurities, nor that Congress intended the term to have that meaning. The record does not establish that the calcium fluoride content of fluorspar is determined in the trade by any one particular method. The Mexican mining method is the only one that is used in the field by technicians rather than skilled chemists. It was designed especially for the analysis of Encantada acid grade fluorspar, which was free from metals other than a trace of iron and a few tenths of 1 percent of alumina. It is evident, therefore, that this method has a limited application and cannot be considered as generally accepted or used by the trade.

The other methods were used in laboratories which were in the business of assaying metallurgical products. Again, there is no evidence that any one method was generally accepted or used commercially. What does appear is that the chemists were endeavoring to determine as accurately as possible the actual percentage of calcium fluoride in fluorspar. Since their analyses were made for the trade, there is no conflict between a scientific determination or principle and the actual commercial application. The most accurate determination controls, both commercially and for customs purposes.

The record presented establishes that Customs Method No. 207.1 is the most accurate method of analyzing fluorspar. The analyses by that method, including an extensive series of tests by Government chemists, show that the calcium fluoride content of the instant merchandise was less than 97 percent. Therefore, it was properly assessed with duty at $8.40 per ton under paragraph 207 of the Tariff Act of 1930.

The protest is overruled and judgment will be entered for the defendant.

CONCURRING OPINION

DONLON, Judge: I concur in the result but not in the opinion, as I did in *T. H. Gonzalez* v. *United States*, 40 Cust. Ct. 9, C. D. 1949, when this case was before us earlier.

The entry which is the subject of this protest covered three carloads of fluorspar. The customs laboratory analyses showed, as to two of the carloads, a calcium fluoride content of more than 97 percent; and as to the third carload a calcium fluoride content of less than 97 percent. That is the breaking point, 97 percent, that has been established for assessment at different duty rates.

Plaintiff accepts the customs laboratory analyses as to the two carloads where report is favorable to its claim. Objection is made only to the test as it was applied to the third carload which, using the same method that was used as to the other two carloads, shows that the fluorspar of that one carload did not measure up to the 97 percent content necessary in order to get the benefit of the lower duty rate.

This is an inconsistent position, to say the least.