(C.D. 4719)

J. D. SMITH INTEROCEAN, INC.; ET AL. v. UNITED STATES

Court Nos. 72–10–02178, etc.

(Decided November 10, 1977)

*Donohue and Donohue* (*Joseph F. Donohue, Sr., Joseph F. Donohue, Jr.,* and *James A. Geraghty* of counsel) for the plaintiffs.

*Barbara Allen Babcock,* Assistant Attorney General (*Max Schutzman* and *Sidney N. Weiss,* trial attorneys), for the defendant.

FORD, Judge: This action involves a joint trial of seven cases listed in schedule A, annexed hereto and made a part hereof. The cases arise from four separate shipments of a petroleum derivative variously described on the invoices as "Unfinished Heavy Naphtha," "Heavy Unfinished Naphtha" or "Unfinished Naphtha." The merchandise was produced in the Virgin Islands and shipped by Hess Oil Virgin Islands Corp. Entries were made in the names of two customhouse brokers for the account of several oil companies or directly in the name of the importer of record.

The merchandise involved was classified by customs under item 475.25, Tariff Schedules of the United States, which provides for duty at the rate of 1.25¢ per gallon on motor fuel. Plaintiffs contend the imported merchandise is naphtha and as such subject to classification under item 475.35, Tariff Schedules of the United States, which prescribes duty at 0.25¢ per gallon. The pertinent provisions of the tariff schedules are as follows:

General Headnotes and Rules of Interpretation

\* \* \* \* \* \* \*

10. General Interpretative Rules. For the purposes of these schedules—

\* \* \* \* \* \* \*

(e) in the absence of special language or context which otherwise requires—

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined;

\* \* \* \* \* \* \*

Schedule 4, part 10 headnote:

\* \* \* \* \* \* \*

2. For the purposes of this part—

\* \* \* \* \* \* \*

(b) "Motor fuel" (item 475.25) is any product derived primarily from petroleum, shale, or natural gas, whether or not containing additives, which is chiefly used as a fuel in internal-combustion or other engines.

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 475.25 | Motor fuel _____ | 1.25¢ per gal. |

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 475.35 | Naphthas derived from petroleum, shale oil, natural gas, or combinations thereof (except motor fuel) _____ | 0.25¢ per gal. |

Presented by the parties for determination is the issue of whether the imported merchandise conforms to the standards for motor fuel. Additionally, as a matter of proof, defendant has raised the issue of whether the samples analyzed by plaintiffs are in fact the samples of merchandise at bar.

The record consists of the testimony of two witnesses called on behalf of plaintiffs and two on behalf of the defendant. In addition, plaintiffs have introduced into evidence 9 exhibits and the defendant has introduced 1 collective exhibit containing 11 reports of the U.S. Customs Laboratory covering the 11 entries involved. The entry papers have been received in evidence without being marked. At the outset of the trial plaintiffs abandoned entry 100497 of Court No. 73–2–00550. Accordingly, claims as to said entry and action are hereby dismissed.

By virtue of the classification under item 475.25 *supra* and the defendant's answers, there is no issue of fact regarding the derivation of the imported merchandise from petroluem. Of primary importance is whether the samples analyzed by plaintiffs or those analyzed by defendant represent the imported merchandise. The record establishes that customs submitted samples to the customs laboratory indicating entry numbers or ID numbers. Plaintiffs contend they submitted samples to customs which defendant denies. The analyses of plaintiffs are not connected by entry number but rather by vessel and date of sampling and testing. Ordinarily, information containing the name of the vessel and the date the merchandise was sampled and tested might, easily establish a connection with the importations. However, in the, instant case the tankers have many compartments which were described as follows:

Q. When you speak of a "composite" and a "compartment," what is a "compartment"? Please describe the cargo which is in a compartment?—

Where is it? Is it in a tank or——? A. Each ship literally consists of a number of compartments. This is done for reasons of shipping. The material has to be spread out evenly so that you can't have material in the forward and aft section—the ship will split in half. Consequently, when you load a ship it has to be loaded in such a way so that when you unload it at a port, the receiving terminal, you have to take it off in the right allocation, or the right sequence; so that, in turn, no damage is done to the ship itself. So that you could wind up, if you are carrying three different materials aboard a vessel, you could literally wind up having compartments one port and starboard; three center; seven port and starboard; nine center—of one material; and, then, spread the rest of the other two compartments or products, out approximately the same way—so that when you unload one material literally you have a balance laying in the water and there is no part of that ship that has any extra stress on it.

Q. After you have taken what you have described as a composite sample of the merchandise on the vessel, what is done with those samples?—A. I might also say, I did forget to mention that when we take the composite sample we take average samples out of every compartment—which means we put a sampler down at the bottom and pull it through, so that you get a proportion of every part of the compartment—and that's what's used as a composite.

It is evident from the foregoing that there may be variations between the compartments. Both parties have utilized the ASTM tests designated in T.D. 66–23(13) as D–287, D–86 and D–323. Plaintiffs, also performed additional ASTM tests which are not pertinent to. the decision.

Chemistry, unlike law, is an exact science. Since both parties had chemists analyze the imported merchandise using the same method; ASTM, the results for the identical merchandise should be the same or within a reasonable tolerance. This, however, is not the fact and

neither party has challenged the competence of the chemists. The court agrees with defendant that there has been no showing of a connection between the imported merchandise and that analyzed by plaintiffs' chemists.

Plaintiffs further contend the length of time between taking of the samples and the analyses by the Government might cause evaporation which could change the results. This contention with respect to evaporation is not borne out by the tests. The testimony of Messrs. Sparkman and Koval establish that if evaporation had taken place the A.P.I. gravity tests and the Reid vapor pressure tests would have shown a decrease. Their testimony also establishes that the 10%, 50% and 90% distillation tests would have shown an increase if evaporation had occurred. Plantiff's exhibit 1 reveals an A.P.I. gravity of 58.7 while defendant's exhibits A–3 through A–9 establish an increase of an A.P.I. gravity to 59.5.

Similarly, plaintiff's exhibit 3 indicates an A.P.I. gravity reading of 58.0 while defendant's exhibit A–2 shows an increased reading to 59.2. The A.P.I. gravity as shown by plaintiffs exhibit 5 is 60.9 and defendant's exhibit A–1 shows an identical reading. While the distillation tests should have shown an increase if evaporation occurred, plantiffs' exhibit 2 gives a 90% distillation reading of 334 degrees, while defendant's exhibits A–10 and A–11 show a decrease to 333 degrees. Based upon these findings it appears that the length of time between sampling and testing by the customs laboratory did not establish the occurrence of evaporation, which would affect the results of the analyses.

The court does not have before it for determination the usual questions involved in chemical cases, such as whether one method of analysis is better than the other as in *T. H. Gonzalez* v. *United States*, 54 CCPA 104, C.A.D. 918 (1967), *aff'g* 53 Cust. Ct. 149, C.A.D. 2487 (1964) or whether the method of sampling by one party is in accordance with recognized standards. Where there is no adequate testimony connecting the sample with the importation, any testimony as to the use of the merchandise is not sufficient to establish such use. *Hawley & Letzerich et al.* v. *United States*, 19 CCPA 47, T.D. 44893 (1931).

The testimony relating to taking of samples by plaintiffs, their testing and use, are of little value unless such testimony can connect the samples tested with the importations. The testimony adduced herein does not satisfactorily connect the tests performed by plaintiffs with the importations. Defendant, on the other hand, while denying plaintiffs provided samples to the Government, was not aware of how or by whom the samples analyzed by the Government chemists were obtained. They were, however, designated as samples by entry numbers or ID numbers while plaintiffs' samples were designated by vessels and date of sampling and testing. The samples and tests performed by customs, in the absence of contrary evidence, are pre-

sumed to be correct. *Cresca Co. (Inc.)* v. *United States*, 15 Ct. Cust. Appls. 105, T.D. 42185 (1927).

Based upon the record made, plaintiffs have failed to overcome the presumption of correctness attaching to the classification. In view of this finding it is unnecessary for the court to consider the various other questions raised by plaintiffs. The action is, therefore, dismissed.

Judgment will be entered accordingly.