(C.D. 2604)

Frank P. Dow Co., Inc., of L.A. *v.* United States

United States Customs Court, First Division

(Decided December 27, 1965)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*James F. O'Hara* and *Richard J. Kaplan*, trial attorneys), for the defendant.

Before Oliver, Wilson, and Nichols, Judges

Oliver, Judge: The protest in this case involves merchandise invoiced as pulverized frit FB130/P and FB140/P, imported at Los Angeles on February 11, 1960, and assessed for duty at 34 per centum ad valorem under paragraph 231, Tariff Act of 1930, as modified by T.D. 54108, as ceramic and glass frostings, in any form other than ground or pulverized. Plaintiff contends that, while the merchandise is properly classifiable under paragraph 231, it is dutiable at only 12½

1

per centum ad valorem as glass frostings, ground or pulverized, within the meaning of said paragraph, as modified by T.D. 54108.

The pertinent portion of paragraph 231, Tariff Act of 1930, as modified by T.D. 54108, reads as follows:

Smalts, frostings, and all ceramic and glass colors, fluxes, glazes, and enamels:

| | |
|---|---|
| Ground or pulverized_____ | 12½% ad val. |
| In any other form_____ | 34 % ad val. |

Upon the trial, it was stipulated between counsel that the involved merchandise is a glass frosting and, therefore, the only issue in this case is whether it was ground or pulverized at the time of importation. With the presumption of correctness attaching to the collector's classification, it falls to the plaintiff to establish, by substantial and competent proof, the state or form of the merchandise contained in the entry covered by the protest involved herein.

The record consists of the testimony of five witnesses and the introduction of three exhibits.

The plaintiff called as its first and only witness, Mr. Roy H. Brown, who testified concerning the following: He was employed for 18 years with the Los Angeles Chemical Co., the company for whose account the merchandise was imported (R. 4). From 1949 to 1961, he was foreman of the ceramic color division (R. 4). The company's business is the jobbing and manufacturing of industrial chemicals, insecticides, and laboratory supplies and related chemicals. It was his duty, as foreman, to oversee the manufacture of ceramic colors which are used in decorative glaze for the tile, pottery, and china industries. The witness testified that he was familiar with the invoiced merchandise because he had assisted the company's ceramic engineer in the development of such frits, samples of which were sent to the English manufacturers to be matched and were later returned for comparison. The process developed was described by the witness as the crucible method wherein raw materials, such as soda ash, di-chromium, zinc, or lead, are placed in a small blast furnace and brought to a temperature of roughly 3,000 degrees until the materials are fused (R. 6). It is then put through a cold water bath, crystallized to obtain a glassy effect. At this stage, the material is in long slender threads or small chunks. It is then subjected to the grinding process of a ball mill in which the impact of balls grinds the cooled material (R. 14). The witness explained that the difference between the FB130 frit and FB140 frit is that one contains zinc and the other does not but that the "P" after each type of frit indicates that it was pulverized (R. 6–7). The witness further explained that, to determine whether a material is ground or pulverized, they subject it to a standard style screen test which is common to the industry as a whole (R. 15). A 10-inch screen would have 10 openings to the inch, a 20-inch screen would have 20

openings, and so on up to extremely fine screens of over 80 openings per inch. In his opinion, material which passes through a 10 mesh or higher screen would be a ground material. That which passes through from a 20 mesh to the plus 80-mesh screens, would be a pulverized material (R. 15).

Plaintiff proceeded to introduce a sample of FB130 material, which was received in evidence as plaintiff's exhibit 1 (R. 9). Plaintiff's witness, Mr. Brown, testified that the material in exhibit 1 was representative of the merchandise described on the invoice in this case, although he was unable to say whether it came from the shipment under protest or a prior one (R. 8).

Defendant called as its first witness, Mr. Redvers G. Nicholson, chief chemist of the United States Customs Service in Los Angeles. He had been assistant chief chemist for approximately 20 years prior to his present position, which he had held for $6\frac{1}{2}$ years. Mr. Nicholson testified that he was familiar with the merchandise described on the invoice by virtue of a sample delivered to his laboratory, upon which he conducted an analysis (R. 20) as reported in Customs Laboratory Report No. 508, subsequently received in evidence as defendant's exhibit B (R. 64). The following testimony, as related by this witness, was, at first, stricken from the record, upon plaintiff's motion, for failure to prove the identity of the sample analyzed in Laboratory Report No. 508 as coming from the invoiced merchandise, but later, upon motion by the Government, it was restored to the record (R. 70). The merchandise analyzed was FB140/P, purportedly taken from entry No. DE 42549, the entry involved in this case, and imported by the Los Angeles Chemical Co. It was received in the laboratory on February 16, 1960, with the request to determine whether it was pulverized and, if not, to identify it (R. 23). The material was put through a screen test and the following report was made (R. 23):

The sample is a frit, or ceramic enamel, which has been crushed to coarse granules. Sieve analysis: plus 8 mesh—14.9%; plus 10 mesh—12.5%; plus 20 mesh—55.8%; plus 30 mesh—7.5%; plus 40 mesh—4.3%; plus 50 mesh—2.2%; plus 60 mesh—0.6%; plus 80 mesh—0.8%; minus 80 mesh—1.4%. In our opinion the sample has not been ground or pulverized.

Based on the results of this test, Mr. Nicholson testified that, in his opinion, the material was neither ground nor pulverized (R. 24). Specifically, the witness stated (R. 27):

A. 20 mesh and finer, the material would have to be ground in a ball mill for all of it. Now, don't read into my words. That's for all of it. Now, you can have a process where you're going to have a graduation of material, and that's what you have there. That starts out with about 83% of it is above the 20 mesh.

X. Q. When it says here "plus 20 mesh," does that mean that that went through?—A. No. That means that didn't go through. That's just it. That's our regular terms. 83% of that, if I remember correctly, did not go through. You can add them up. 55 and 27 is 82, and here's the fraction. A little over 83% wouldn't go through a 20 mesh sieve. That's a coarse material.

He testified, further, that the material analyzed differed from that represented by exhibit 1, in that the former was a coarse granular substance while the latter was a powder (R. 21). It was his opinion that the material in exhibit 1 would be considered as ground or pulverized, based upon sight and touch (R. 28).

At the close of this witness' testimony, the trial was continued to the following docket in order that the Government be given the opportunity to prove the connection between the laboratory analysis of Mr. Nicholson and the shipment of merchandise under protest in this case (R. 40, 43).

Upon resuming, the Government introduced three witnesses, the first of whom was Mr. Felix G. Sanders, a sampler with the Bureau of Customs, Los Angeles, Calif. He testified that, as a part of his duties, he takes samples of merchandise from particular importations when requested to do so by his supervisor. The request is received in the form of defendant's exhibit A (R. 44, 49), and LA-6, sampler's report form. Exhibit A is a request, dated February 11, 1960, to sample entry No. DE 42549 and requires a sample of one package from the shipment of merchandise covered by that entry number (R. 46). Such requests are accompanied by the invoice (R. 46). The witness testified that the writing appearing on the sampler's side of LA-6 was his own and that the information contained thereon was taken from the attached invoice. Such information corresponds with the entry papers in DE 42549 and relates to the headmark of the shipment, the country of origin, and the name of the merchandise, and, in addition, shows the mark "S-1" which indicates that he sampled one package from lot number 1 to 80 of the "Pulverized Frit FB140/ P," contained in 80-pound paper bags (R. 47). The slip is signed by the witness and dated February 15, 1960. After taking the sample, it is sent to the appraiser's stores, labeled with the entry number, the date of entry, the headmark of the merchandise, and the examiner's name. It is to be placed on the examiner's table at the appraiser's stores, while the invoices, with exhibit A attached, are turned over to a clerk (R. 48).

On cross-examination, the witness explained that he had no independent recollection of the particulars in this case, but relied on the information bearing his signature (R. 50). On redirect, Mr. Sanders stated that the procedure he followed here was followed in every case where a request for sampling is received (R. 51).

The Government's second witness was Mr. James T. Pierson of the United States Appraiser's Stores in Los Angeles, Calif. He testified that, at the time in question, he was employed as examiner's aide to Examiner Bucher, whose lines of merchandise included frostings under paragraph 231 (R. 53). Mr. Pierson stated that, in the ordinary course of his duties, he would receive the invoice with the attached exhibit A form from a slot provided for each examiner, and the information contained thereon would indicate that a sample of the merchandise from the noted entry number was left in the customs warehouse on the table assigned to his examiner (R. 54). Taking the attached papers along, he then could identify the sample involved by matching the information contained therein with the markings on the sample as to entry number, date, and headmarks (R. 54). The sample is then inspected and customs Form 6479 is filled out describing the merchandise and directing specific questions to the laboratory as to what information is desired (R. 55). The witness then testified that his notations on both the invoice and exhibit A indicate that CF 6479 was completed and that the sample was taken to the laboratory on February 16, 1960 (R. 55).

On cross-examination, Mr. Pierson testified that it is customary to receive more than one sample tag and invoice, and, therefore, several samples a day. He stated that, while the possibility of a mixup is present, he never recalled that it ever happened (R. 57).

Defendant's final witness was Mr. Albert H. Schneider, assistant chief chemist to Mr. Nicholson in February 1960.* Mr. Schneider testified that, upon receipt of a sample in the laboratory, an entry is made in a logbook, which is a record made in the ordinary course of their business (R. 59). The logbook contains a description of the merchandise, the entry numbers, the date it is received, and the date of the report (R. 58). This information is taken from customs Form 6479 which is attached to the sample (R. 63). The witness testified, further, that he is in charge of keeping the logbook, although in a supervisory capacity. The actual entry in this case was made by his secretary, whose handwriting he identified. The log entry showed that the sample was received on February 16, 1960, given laboratory number 508, and was reported completed on March 7, 1960 (R. 60, 61). All the information contained in the logbook and as reported in laboratory report No. 508, defendant's exhibit B, was the same, insofar as identification is concerned, with that contained on the involved invoice and exhibit A, related above.

On cross-examination, the witness explained that, although Mr. Nicholson conducted the actual analysis, he witnessed it and signed the

---

*During the time from the first hearing of this case on the February 1963 docket, Mr. Nicholson passed away.

laboratory report together with the chief chemist (R. 64). It was his recollection that the analyzed merchandise was dissimilar to the merchandise in exhibit 1, in that the sample was a granular material and not in powder form as exhibit 1 (R. 65).

At the close of the testimony, the Government moved to reinstate the previous testimony of its witness, Mr. Nicholson, as it applied to the analysis he conducted and his opinion on the state of the merchandise so analyzed. The motion was granted on the basis that it was adequately shown that the sample reported in laboratory report No. 508 had come from the importation at bar (R. 70).

We think that the granting of this motion to reinstate was proper.

The combined testimony of the Government's witnesses relates a story of careful, systematic procedure from the time a sample request is received until a laboratory analysis is made and reported on customs Form 6415. Diligent steps are required to insure that the sample analyzed will relate to the importation of merchandise giving rise to the inquiry contained in customs Form 6479. The acts of customs officials to effectuate this procedure, unless the contrary is shown, are to be presumed to have been correctly executed, *Inlander-Steindler Paper Co.* v. *United States*, 45 Cust. Ct. 446, 449, Reap. Dec. 9756; *Knauth* v. *United States*, 1 Ct. Cust. Appls. 178, 180, T.D. 31216. Moreover, it has been clearly demonstrated that the information contained in exhibits A and B was entered by those in authority and in the ordinary course of their business. As such, they are readily admissible as evidence of the transactions they disclose, 28 U.S.C., section 1732(a). More than this, they are said to be of more trustworthy value than mere subsequent recollections (recalled), *Cf.* Wigmore on Evidence, third edition, volume V (1940, Supp. 1964), sections 1521(5), 1523.

The court has found it necessary to review at length the evidence establishing the authenticity of the merchandise, the subject of laboratory report No. 508, because of the conflict of facts it poses with the merchandise contained in plaintiff's exhibit 1. The conflict is unaffected by the fact that exhibit 1 pertains to FB130/P frit and exhibit B to FB140/P frit. As plaintiff concedes in its brief, page 5, the only difference represented by these two code numbers is that one frit contained some zinc and the other did not. The presence or absence of zinc does not affect the issue as to whether the merchandise was ground or pulverized upon entry.

While the evidence establishes that the merchandise analyzed in exhibit B came from the importation at bar, the same is not true for the merchandise contained in exhibit 1 and therein the conflict is resolved. Plaintiff's witness Brown testified that he was unable to say which shipment of merchandise was represented by exhibit 1

(R. 7, 8). The merchandise covered by entry No. DE 42549 is the only merchandise with which this court need to be concerned, *T. H. Gonzalez* v. *United States*, 40 Cust. Ct. 9, C.D. 1949. Furthermore, plaintiff's witness, although personally aware of no shipment differing from the powdered frit of exhibit 1, was in no position, not having been to England, to testify as to the quality control methods employed by the English manufacturers or to certify the uniformity of their results.

Moreover, the witness testified that he had to call for the sample in exhibit 1, and it was brought to him during the trial (R. 7). There is absolutely no evidence in the record as to who actually took the sample or from whence it came. Not only were there several shipments of the English manufactured frit, but there was also domestic frit produced and in existence at the Los Angeles Chemical Co.

Based upon the record in this case, the court is unable to rely upon the facts adduced concerning exhibit 1. Plaintiff, in its brief, argues that it would seem unlikely, considering the economic advantages obtainable from grinding abroad, both in grinding costs and duty costs, that it would not import the merchandise in the claimed form. While the reasonableness of this argument is apparent, nevertheless, the court is constrained to decide each case on the record made.

Holding, as we do, that exhibit B is representative of the merchandise at bar, it is clear that, in its imported state, it was neither ground nor pulverized. Neither party has cited to this court any judicial interpretation of the term "ground or pulverized." The court's own research reveals that the exact construction of these words, as they appear in paragraph 231 of the 1930 tariff act, has apparently never been passed upon before.

However, in *United States* v. *J. P. Reiss Co.*, 18 CCPA 159, T.D. 44373, the court of appeals had before it a case involving the identical paragraph under the Tariff Act of 1922. The merchandise consisted of very small bits of glass "evidently reduced to their present form by some process of grinding or pulverizing." This same glass was then put through a heated tower by means of which glass in globular form was produced. The court held that, though initially ground or pulverized, the glass had been advanced beyond that stage when imported and, therefore, was of a form other than merely ground or pulverized.

In a more recent decision by the appellate court, *United States* v. *Colonial Commerce Co., Ltd., et al.*, 44 CCPA 18, C.A.D. 629, the court stated that, in determining whether merchandise was ground under paragraph 781 of the 1930 tariff act, two factors were important: The process by which the material was reduced in size, and the fineness of the particles produced so as to be acceptable to the trade

involved as ground material. The court held that the term "grinding" was broad enough to encompass a fairly wide latitude of processes, saying, at pages 20 and 21:

We are in agreement with the holding in the *Frame* case, as above construed, since we think that, although grinding is necessarily a physical process involving the application of friction, or crushing, to the material at hand, the term is broad enough to cover a variety of processes by which materials are divided into relatively small particles. That conclusion is supported by the following dictionary definitions: Webster's New International Dictionary, Second Edition, 1950, defines "grind" as:

To reduce to *powder* by *friction* as in a mill, or with heat. [Italics supplied.]

Funk & Wagnall's New Standard Dictionary, 1941 Edition, defines the same verb as:

To reduce to *fine particles or powder* by crushing and friction; triturate; as to grind wheat. [Italics supplied.]

In the Century Dictionary and Cyclopedia, Revised Edition, "grind" is defined as:

To *break* and *reduce* to *fine particles* by *pounding, crushing,* or *rubbing,* as in a mill or mortar, or with the teeth. [Italics supplied.]

It is to be noted that while two of the above definitions state that grinding involves a reduction in size "as in a mill," they are not limited to the use of a mill, but mention it only as an example. [Italics quoted.]

The trouble with the proof offered in this case is that even under the scope of the *Reiss* decision, *supra*, concentrating as it did on the reducing process as opposed to the fineness of the product, the testimony is based entirely on hearsay and not the personal knowledge of the witness (R. 10).

What is more, the evidence is totally unsatisfactory with respect to the size of the particles produced, i.e., a size that would be considered ground or pulverized by those in the trade, as stressed by the court in the *Colonial Commerce* case, *supra*. Keeping in mind that in the situation before us we have not only testimony concerning the fact that in determining the groundness of frit material in the ceramic industry the standard screen test is used, but also the record reveals the same method of testing used by customs officials with the corresponding presumption of correctness attaching to the results. *Cf. T. H. Gonzalez* v. *United States, supra*. It was the opinion of the chief chemist for the customs laboratory, familiar with the testing of such merchandise (R. 31), that where 83 percent of the tested frit is unable to pass through a plus 20 mesh, it is coarse in nature as opposed to the powdered form of a frit, ground or pulverized (R. 27).

Plaintiff claims that its witness Brown testified concerning the industry's designation of what constitutes a "ground" frit. We do not

agree with this view of the record. After stating that the screen test is the standard measure for testing in the industry, Brown testified with respect to his own company's practice of designating material as ground or pulverized (R. 15). There was no showing that its practice was in accord with the industry as a whole. Nevertheless, it can be noted that applying its own criterion, the plaintiff's merchandise is not ground, much less pulverized, as initially contended. Brown stated that where *all* the material tested passes through a 10-mesh screen, it can be considered ground (R. 15). Exhibit B demonstrates that, even on this basis, more than one-fourth of the material failed to pass through the 10-mesh screen. The material varied in particle sizes to such a degree (R. 65, 66) that it lacked sufficient fungibility to meet even the minimum standard for groundness, as contained in this record. It appears that the merchandise was imported in rather coarse granular form rather than in fine or powdered form, regardless of the reduction process used.

Plaintiff has failed to sustain its claim that the merchandise at bar was, at the time of entry, ground or pulverized. For the reasons stated, the protest herein is overruled.

Judgment will be rendered accordingly.