(C.D. 4303)

ALUMINUM COMPANY OF AMERICA *v.* UNITED STATES

United States Customs Court, Third Division

(Decided December 13, 1971)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *James S. O'Kelly* of counsel) for the plaintiff.

*L. Patrick Gray, III,* Assistant Attorney General (*Morris Braverman,* trial attorney), for the defendant.

LANDIS, Judge: The sole issue in this protest is whether fluorspar, a mineral substance of sorts, contained over or, not over, 97 percent by weight of calcium fluoride when imported from Spain in shipments entered at Point Comfort, Texas, on September 6, 1967 and December 26, 1967.

The record attests that looking to classification and duty assessment, the importer had samples of the fluorspar taken from both shipments. Those samples, properly prepared, were subdivided into lots (identified with each shipment), some of which were sent to customs for laboratory analysis of the calcium fluoride content, and some of which were retained for the account of the importer.

Customs laboratory analyses [1] reported that both shipments contained not over 97 percent by weight of calcium fluoride. Duty was accordingly assessed at $8.40 per ton under the Tariff Schedules of the United States (TSUS) item 522.24.

Plaintiff here contests the duty assessment under TSUS item 522.24 and, based on independent tests and analyses, claims that the imported fluorspar contained over 97 percent by weight of calcium fluoride, dutiable at $2.10 per ton under TSUS item 522.21.

At the trial, plaintiff produced six witnesses, who testified to their part in the shipment, sampling and analyses of the imported fluorspar. There is also documentary evidence. In its brief, plaintiff argues that certain exhibits should be received in evidence. Since these exhibits are not material to the result we reach with respect to the presumption that customs correctly classified the fluorspar, no purpose would be served in discussing the question of their admissibility. The testimony of the two customs chemists, who tested and reported their analyses of the imported fluorspar for defendant, completes the record.

Whether fluorspar contains over, or not over, 97 percent by weight of calcium fluoride is a question determined exclusively by test and analysis. The sense of the record is that there are several approved methods for analyzing the calcium fluoride content of fluorspar; that analyses of the same sample, even by the same method, more often than not, vary one from the other, and that the accuracy of a particular analysis, where the result is close to the dividing line (i.e., over or, not over 97 percent by weight of calcium fluoride), is a matter of running a second analysis to check the result.

It is established that the customs chemists used "Customs Method 207.1" [2] (a concededly reliable and accurate method when properly

---

[1] The reports (Customs Form 6415) in evidence are attached to the official entry papers covering each shipment.

[2] Customs Method 207.1 (exhibit 8) is a five page document, describing and footnoting the method in technical terms.

conducted, see plaintiff's reply brief, page 2) to make their analyses. The results they obtained if not rebutted are presumed to be correct. *Consolidated Cork Corp. et al.* v. *United States*, 54 Cust. Ct. 83, C.D. 2512 (1965). Plaintiff produced witnesses who testified that they analyzed samples of the imported fluorspar and that the samples contained over 97 percent by weight of calcium fluoride. For plaintiff to prevail, however, the record must show more than this, viz: that the analyses by customs that the fluorspar contained not over 97 percent by weight of calcium fluoride were inaccurate, *T. H. Gonzales* v. *United States*, 54 CCPA 104, C.A.D. 918 (1967); affirming *Id.* v. *Id.*, 53 Cust. Ct. 149, C.D. 2487 (1964); *United States* v. *Gage Bros.*, 1 Ct. Cust. Appls. 439, T.D. 31503 (1911). It is plaintiff's contention that the testimony of the customs chemists establishes that they did not follow all the steps prescribed in Customs Method 207.1 and that the results they reported are, therefore, not accurate. On this record, we are unable to sustain plaintiff's claim and overrule the protest.

Customs chemist Pittman, in his direct testimony, described the steps he followed in his analysis that the fluorspar samples contained close to but not over 97 percent by weight of calcium fluoride. He did so in some detail, and, so far as the record discloses, did not refer to any documented method to refresh his recollection. He stated that what he had described was Customs Method 207.1. Customs chemist Pastor testified that when he received the customs fluorspar samples, knowing only that Mr. Pittman had found not over 97 percent by weight of calcium fluoride, he analyzed the samples in the manner described by Mr. Pittman following Customs Method 207.1. Plaintiff, at pages 35 and 36 of its original brief (plaintiff also filed a reply brief), argues that the customs analyses are not accurate because Mr. Pittman in the steps which he described he followed:

(1) failed to "state a significant step in customs method 207.1 with regard to the step following the addition of 3-ml of hydrofluoric acid to 'ignite at a red dull heat (600 degrees C.)'."

(2) testified that "after the sample is converted to calcium sulphate, it's placed in a 600 ml beaker with 150 ml of one plus nine hydrochloric acid and placed on a hot plate for an hour to an hour and a half to dissolve the calcium sulphate", when in fact Customs Method 207.1 prescribes 1.19 hydrochloric acid and digest on a steam bath. (Plaintiff concludes that Mr. Pittman used "roughly twice the strength of acid called for by the method" and faults placing the sample on a "hot plate" instead of the "better dispersed heat of a steam bath".)

(3) failed "to include the sulphite separation stage which be-

gins with the first full paragraph on page 3 of exhibit 8 and ends with the words 'most of the hydrogen sulphide' ".[3]

Plaintiff, with an oversize chart of Customs Method 207.1 available in the courtroom (plaintiff prepared the chart and offered it in evidence as exhibit 9), cross-examined Mr. Pittman on what he did as follows:

Q. Did you mention drying the sample?—A. Yes, I did. When, after it is rough weighed, I dry the sample in the oven at 105 to 110 degrees to dry.

Q. Did you mention stirring during the acetic acid leech?—A. No, I didn't mention it, but we do stir.

Q. Did you dry the sample before measuring out the half a gram?—A. No, I did not, before the rough weighing, I did not.

Q. Isn't it required to be done in that order by Customs' Method 207.1?—A. I don't think specifically it is required, whether it's required before the analytical weighing, yes, but not necessarily before the rough weighing.

Q. Would you agree that if you had omitted any step called for by Customs' Method 207.1, your analysis would not be accurate?— A. Depending on what you call a step. You mean any particular sentence in the whole method?

---

[3] Relevant to these points, Customs Method 207.1 describes and footnotes the method as follows:

Treat the residue in the crucible with about 3 ml. of hydrofluoric acid and ten drops of nitric acid, and evaporate to dryness under a hood. Evaporate to dryness twice more with additional 3-ml. portions of hydrofluoric acid and ignite at a dull red heat (600°C.). Cool in a desiccator to room temperature, weigh, and from the weight of the residue determine the approximate percentage of calcium fluoride (Note 3).

Add 3 ml. of sulphuric acid and swirl to disperse the sample. Place the crucible on a regulated hot plate or sand bath (Note 4) and slowly increase the heat, swirling occasionally. Evaporate to dryness with moderate fuming. Cool, add 2 ml. of sulphuric acid, swirl to loosen the residue and again evaporate to dryness. Bake the crucible and its contents for 10 minutes at 500°C. Cool the crucible and immerse in a 400-ml. beaker containing 150 ml. of hydrochloric acid (1:19). Digest on a steam bath for one hour. Remove the crucible from the beaker, carefully washing the liquid and any adhering solid particles into the beaker with the aid of a fine stream of hot hydrochloric acid (1:19).

Boil the contents of the beaker for ten minutes. If any insoluble matter remains (Note 5), filter through an 11-cm. fine paper (Schleicher and Schuell No. 589 Red Ribbon, or equal), wash with hot hydrochloric acid (1:19), and reserve the filtrate. Ignite the paper and the residue in the platinum crucible. Treat the ignited residue with a few drops of hydrofluoric acid and sulphuric acid, evaporate to dryness, and digest on a steam bath with 2 ml. of hydrochloric acid. Add this solution to the reserved filtrate.

Pass hydrogen sulphide into the combined solution for a few minutes and then make it ammoniacal (Note 6). Continue the gassing for ten minutes and then allow the precipitate to settle for twenty or thirty minutes. Filter, using an 11-cm. fine paper (Schleicher and Schuell No. 589 Blue Ribbon, or equal). Wash the paper and precipitate with the ammonium chloride—ammonium sulphide wash solution.

Neutralize the filtrate and washings with hydrochloric acid and add 20 ml. of the acid in excess. Boil under a hood for two or three minutes to expel most of the hydrogen sulphide. * * *

Note 3. The residue should contain the calcium fluoride originally present in the sample (except the small amount, about 0.2 per cent, lost in the acetic acid digestion for which a correction is made) as well as small quantities of impurities not removed by the foregoing treatment.

If the calcium fluoride content at this point is substantially below 97 per cent and the result of the analysis of a standard reference sample (which should be comparable in composition to the sample being tested) checks closely with its known calcium fluoride content, the determination need not be carried further. Otherwise, the remainder of the analysis must be performed.

Note 4. Infra-red heating from above usually proceeds very smoothly and requires less attention than when a hot plate alone is used.

Note 5. This residue may consist of barium sulphate, lead sulphate, or undecomposed calcium fluoride. It is treated in order to ensure complete recovery of calcium.

Note 6. A large excess of ammonium hydroxide should be avoided.

Q. Is it not a fact that Method 207.1 required various steps to be taken?—A. Yes, in general.

Q. All right, my question is if you had omitted any of those steps, would it have affected the accuracy of your analysis?—A. Yes. It's possible. If I had omitted a critical step, yes, it could.

Q. What is the significance of the acetic acid leech step, I believe it's Step 2.

\*       \*       \*       \*       \*       \*       \*

A. The purpose of the acetic acid leech is to remove the calcium carbonate from the fluorspar or any other calcium salt, calcium solubles.

Q. Would you agree that it is an important step?—A. Oh, definitely required.

Q. Would you agree that it is more susceptible to error than most of the other steps?—A. Not if it is handled properly, with adequate good analytical techniques, no.

Q. Will you explain that answer, please?—A. Well, if you are sure that the paper is of good quality, as we do use good quality paper, No. 42, which is for very fine precipitate and that the precaution of adding filter pulp to the filter paper and to the sample and that the sample is poured into the filter paper without spillage or spattering and, well, that's essentially it. If you do that.

Q. Have you ever run into the problem of spattering in your analyses of fluorspar?—A. We take precautions and are very careful and conscientious that we don't get spattering.

Q. What precautions do you take?—A. You're very careful when you pour it into the filter paper, that you don't pour into the side of the paper and not into the solution.

The above cross-examination establishes that there are significant and critical steps in Customs Method 207.1 which, if not followed, can affect the accuracy of the analysis. Customs Method 207.1 is in evidence (exhibit 8). It is concededly accurate if the critical and significant steps of the method are followed. Our difficulty is that we do not know, and the record does not establish, which steps of Customs Method 207.1 are significant and critical to accuracy of analysis, and which are not. We find nothing in plaintiff's cross-examination that tends to impeach what the customs chemists directly testified they did in their analyses of the fluorspar samples following Customs Method 207.1. In short, the record offers no basis upon which we can evaluate and weigh the customs chemists' testimony vis-a-vis what they did in following Customs Method 207.1. This brings us to discuss the points of alleged omission and deviation from Customs Method 207.1 alluded to above, which plaintiff raises for the first time in its brief.

Plaintiff, in its brief, would have us find that the customs analyses were inaccurate because the customs chemists, in their testimony, omitted several steps and deviated from others that are described in Customs Method 207.1. It should be noted that defendant, in its brief,

urges similar infirmities in plaintiff's testimony. What we must weigh is whether the customs chemists' testimony of what they did in following Customs Method 207.1 for analysis of fluorspar affected the accuracy of the results stated in the laboratory reports. Plaintiff did not cross-examine the customs chemists on any of the alleged omissions or deviations pointed up in its brief, nor is there any testimony that the alleged omissions or deviations constituted critical departures from Customs Method 207.1.

Cross-examination or testimony in rebuttal might have established that critical steps in Customs Method 207.1 were, indeed, omitted or significantly deviated from in the customs analyses. Customs Method 207.1 is a technical set of instructions for sampling fluorspar. The customs chemists described what they did following those instructions. Plaintiff, if inclined to challege, could have cross-examined the customs chemists and tested what they testified to, paragraph by paragraph, and line by line, with the instructions set forth in Customs Method 207.1. Plaintiff, in the absence of a relevant searching cross-examination now asks us to evaluate and weigh technical testimony against technical instructions and determine that the instructions were not followed. Since we find no evidence which rebuts "the reliability of the government's methods and, in particular, its accuracy in these analyses", *T. H. Gonzalez* v. *United States*, 54 CCPA 104, 107, C.A.D. 918 (1967), the presumption of correctness which attaches to the customs classification has not been overcome, and the protest is overruled.

Judgment will be entered accordingly.